**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SUSAN BERGER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. AW-08-76 |
| | * | |
| METROPOLITAN LIFE | * | |
| INSURANCE CO., | * | |
| | * | |
| Defendant. | * | |
| | * | |

**************************************************************************

## MEMORANDUM OPINION

Plaintiff Susan Berger ("Berger") brings this action against Defendant Metropolitan Life Insurance Co. ("MetLife") challenging the cancellation of her long-term disability benefits. Currently pending before the Court is Defendant's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment. The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the instant motions. On July 15, 2009, the Court conducted a hearing on the pending motions. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated more fully below, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross Motion for Summary Judgment.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

Berger worked for CitiMortgage, a subsidiary of Citigroup, Inc. ("Citigroup"), as a Program Analyst IV. In that job, Berger did clerical level tasks such as computer programming, filing, and managing records. Citigroup provided its employees with a short-term disability ("STD") plan and a long-term disability ("LTD") plan, which are governed by the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Citigroup is the plan administrator for both plans, and MetLife is the claim administrator for both Citigroup plans. Metlife also administers Citigroup's Family and Medical Leave Act of 1993 ("FMLA") requests. As administrator to these plans, MetLife is a fiduciary and must administer benefits claims in conformance with the documents and instruments governing the plans.

In 1999, Berger began to suffer from bilateral carpal tunnel syndrome, as diagnosed by Dr. David Perim. (MET00589.) In late May and early June of 1999, Berger underwent a carpal tunnel release surgery on her left wrist (MET00593) and right wrist (MET00595).[1] In 2000, Berger visited Dr. Perim regarding tingling in her upper right extremities and continued problems with carpal tunnel syndrome. (MET00597-598.) In September 2004, tests confirmed that Berger still suffered from right carpal tunnel syndrome. (MET00599.) There is no evidence in the record describing Berger's medical status between 2000 and 2004.

In December 2004, Berger was involved in a car accident that caused her to sustain painful neck and back injuries.[2] Shortly after her accident, Berger began to see Dr. Walter van den Valentyn, a chiropractor who worked for Quince Orchard Medical Center. Dr. van den Valentyn submitted a Physician Questionnaire to MetLife, which stated that Berger could not work because of pain in her neck and arms. (MET00638-639.) On February 24, 2005, Berger ceased work due to pain and medical problems associated with her neck, shoulders, and right arm. When Berger ceased working, she submitted a request for FMLA leave and a claim for benefits under the STD

---

[1] It is slightly unclear whether Berger underwent right carpal tunnel release surgery in 1999. Some documents suggest that she did; others suggest that she did not. The Court does not find this to be a dispute of material fact.

[2] Berger also appears to have had some back and spine problems predating the accident. (MET00616-618.)

plan. MetLife approved Berger's request for FMLA leave and claim for STD benefits. (MET00631 & MET00635-636.)

After she ceased working, Berger consulted with several doctors[3] and underwent numerous medical procedures on her spine, including a cervical fusion procedure, epidural steroid injections, a rhizotomy,[4] and trigger point injections. Berger was eventually diagnosed as having cervical radiculopathy,[5] which caused her pain in her neck, shoulders, and upper extremities. (MET00619-620.) In addition, Berger continued to suffer severe pain in her wrists. (MET00550-552.)

In May 2005, Dr. Perim performed a second carpal tunnel release surgery on Berger's right wrist. (MET00555.) Dr. Perim also informed MetLife that Berger should not return to work for four to six weeks following her surgery. (MET00548-552 & MET000555.) In the late spring of 2005, Berger was referred to Dr. Sherif Meleka of the Ava Mina Pain Treatment Clinic. (MET00544.) Dr. Meleka diagnosed Berger as having chronic cervical spondylosis, cervical radiculopathy, and cervical facet syndrome. (MET00541-542.)

On May 12, 2005, Berger submitted a claim under the LTD plan. (MET00569-586.) MetLife approved Berger's claim for LTD benefits and informed Berger that she had a continuing obligation to forward medical records that showed continuing disability to MetLife to substantiate her continued eligibility for LTD benefits. (MET00556-557.) Accordingly, after several communications and extensions, Berger's LTD benefits were extended through August 31, 2005.

---

[3] Berger visited Dr. Lester Zuckerman (*e.g.* MET00563), Dr. Donlin Long (*e.g.* MET00565), Dr. Mark Klaiman ( *e.g.*, MET00527-529), and Dr. Raymond Drapkin (*e.g.* MET00504-505.).

[4] Rhizotomy is the surgical severance of spinal nerve roots to relieve pain or hypertension.

[5] "Cervical radiculopathy is the damage or disturbance of nerve function that results if one of the nerve roots near these vertebrae is compressed. Damage to nerve roots in the cervical area can cause pain and the loss of sensation in various upper extremities (such as the arm), depending on where the damaged roots are located." *See* http://my.clevelandclinic.org/disorders/Back_Pain/hic_Back_Pain_Cervical_Radiculopathy.aspx.

(MET00528.)

In late September or early October 2005, Berger submitted an application for Social Security Disability Insurance ("SSDI") benefits. (MET00524-525.) Berger took this action after MetLife informed her that her LTD benefits could be withdrawn or reduced if she failed to apply for SSDI benefits. (MET00532-533.)

On October 11, 2005, MetLife sent Berger a letter advising her that her LTD benefits were terminated retroactive to September 1, 2005. (MET00521-522.) MetLife based this decision on the fact that Berger's health care providers had not provided updated information regarding Berger's condition despite requests from MetLife. (*Id.*) Berger and her health care providers then forwarded additional information to MetLife (*e.g.* MET00520), and MetLife subsequently extended Berger's LTD benefits until December 31, 2005.[6] (MET00495.)

In July 10, 2006, Dr. van den Valentyn submitted document to MetLife saying that Berger still had pain, was only capable of sitting, standing, and walking intermittently for about one hour out of a eight-hour workday, and that Berger could not perform fine finger repetitive movements on her right hand. (MET00450-451.) As reflected by the record, Berger continued to visit Dr. van den Valentyn through at least October 12, 2006.[7] (MET00417.)

While Berger received LTD benefits, she was required to consult with MetLife's Vocational Rehabilitation Counselor (the "Vocational Counselor") to attempt to secure paid work. Berger opted not to apply for several of the positions suggested by the Vocational Counselor. (MET00276-277.)

---

[6] MetLife extended Berger's coverage additional times after December 31, 2005. As described above, Berger's coverage terminated on February 26, 2007.

[7] The record reflects that Dr. van den Valentyn and Dr. Meleka provided frequent reports to MetLife up until October 2006.

4

On August 16, 2006, Berger informed MetLife that she was working as a part-time volunteer at an animal shelter. (MET00276.) Berger apparently volunteered at the shelter two to three days per week for four to six hours per day. (MET00277.) The animal shelter had no paid positions. (MET00281.) Her volunteer duties included feeding animals, doing laundry, and administering medications to animals. (MET00277.) At that time, Berger's doctors had not released her for part-time work. (MET00276-277.)

At the end of September 2006, at the request of MetLife, Dr. Meleka and Dr. van den Valentyn forwarded medical records to MetLife in support of Berger's LTD claim. (MET00438-439.) Specifically, on September 26, 2006, Meleka submitted a report to MetLife reaffirming his original diagnosis of conditions that prevented Berger from returning to her job. (MET00434-437.) Dr. van den Valentyn sent updated records to MetLife on October 23, 2006. (MET00414-433.)

In October 2006, MetLife requested permission from Dr. Meleka for Berger to undergo a functional capacity evaluation ("FCE"), which assessed Berger's level of physical function. (MET00413.) Berger and Dr. Meleka consented to the FCE. (MET00412-413.)

On January 24 and 25, 2007, Berger underwent the FCE. (MET00396-411.) The resulting FCE report found that Berger was "capable of sustaining the Light level of work for an 8-hour day." (MET00402.) Berger argues that FCE was only two hours total, that she suffered a moderate level of pain throughout the FCE, and that the FCE is contrary to all other medical evidence in the record. MetLife argues that the FCE consisted of two to three hours of testing a day for two days. The Court does not find this dispute to involve a material fact.

On January 31, 2007, MetLife forwarded a copy of the FCE report to Dr. Meleka and asked for his comments. (MET00394.) Dr. Meleka then shared the FCE report with Berger, and they both

5

disagreed with the FCE's conclusions. (MET00389.) On February 5, 2007, Dr. Meleka reasserted his original diagnosis of Berger and informed MetLife that he did not believe Berger was capable of performing full-time light work. (MET00392-393.) However, Dr. Meleka opined, and Berger apparently agreed, that Berger could probably work part-time. (*Id.*) There is no evidence in the record showing whether Berger ever attempted to return to working part-time.

On February 26, 2007, MetLife terminated Berger's LTD benefits. (MET00382-384.) MetLife asserted that it terminated Berger's LTD benefits because Berger did not provide additional and objective clinical information in response to the FCE. (*Id.*) However, because Berger's claim was based on self-reported pain and because Berger disagreed with the FCE, MetLife referred the file to an independent physician consultant ("IPC") before making a determination on her benefits. (*Id.*) The IPC reviewed Berger's file and did not find any clinical information that would prevent light work. (*Id.*) Moreover, the IPC found that Berger could perform full-time sedentary work. (*Id.*) MetLife then had its Vocational Counselor perform a Labor Market Analysis, which found that Berger could earn at least 80% of her prior wages. (*Id.*) Thus, MetLife terminated LTD benefits under the "Own Occupation" provision.[8] (*Id.*)

On March 9, 2007, Berger appealed the MetLife's termination decision and requested a copy of her claim file. (MET00381.) MetLife sent the claim file to Berger on April 2, 2007. (MET00378.) On August 10, 2007, the Social Security Administration ("SSA") issued a fully

---

[8] Under the LTD plan, Berger was entitled to receive benefits if "[d]ue to sickness, pregnancy or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis, and . . . [d]uring your Elimination period and the next 60 month period, you are unable to earn more than 80% of your predisability earnings at your own occupation for any employer in your local economy." (MET00164.) Under the LTD plan, "'Own Occupation' means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer." (MET00166.)

6

favorable decision on Berger's SSDI benefits claim. (MET00365-376.) On August 15, 2007, Berger forwarded the SSA's favorable decision to MetLife to support her appeal of the termination of her LTD benefits. (MET00364.) It appears that Berger forwarded no other documents in support of her appeal.

As part of appellate process, MetLife referred Berger's case to a second IPC, who reviewed Berger's file on October 8, 2007. (MET00349-360.) The second IPC reviewed Berger's records, spoke with the therapist who performed Berger's FCE, and considered the SSA's decision. (*Id.*) The second IPC's October 8, 2007 report determined that: (1) the FCE was a valid exam; (2) Berger's medication regime would not pose a risk to her safety if she returned to work; and (3) Berger was capable of performing light duty work but could not perform any work beyond that. (MET00349-360.)

On October 12, 2007, MetLife forwarded the second IPC's report to Berger's health care providers, Dr. Meleka and Dr. van den Valentyn, and requested comments by October 18, 2007. (MET00346.) On October 12, 2007, Dr. Meleka wrote back to MetLife and opined that the October 18, 2007 deadline was unprofessional. (MET00342.) Other than that response, Berger's doctors apparently did not provide additional information to MetLife in response to the second IPC's report.

On October 25, 2007, MetLife denied Berger's appeal. (MET00333-335.) In reaching that decision, MetLife found that the records in Berger's file supported the finding that Berger's position as Program-Analyst was a sedentary position that required use of a computer. (*Id.*) MetLife further found that the records in Berger's file showed the she was no longer disabled under the "Own Occupation" provision of the LTD plan. (*Id.*) In denying the appeal, MetLife informed Berger she had exhausted her administrative remedies under the LTD plan. (*Id.*)

Thus, on January 10, 2008, Berger filed this case. On August 11, 2008, MetLife moved for summary judgment. On September 3, 2008, Berger filed a cross motion for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When parties file cross motions for summary judgment, the court must view each motion in a light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III. ANALYSIS

There are no genuine disputes of material fact in this case, and, thus, the Court must determine which party is entitled to summary judgment. Plaintiff asserts that Defendant abused its discretion by cancelling her LTD benefits and breached its fiduciary duty to her. Each claim is addressed below.

### A. Denial of Benefits

Pursuant to the Employee Retirement Income Security Act ("ERISA"), an employee can bring a civil action to recover benefits due under an employee welfare benefit plans. 29 U.S.C. § 1132 (a)(1)(B) & (e). The denial of benefits under an ERISA plan must "be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 99, 115. "If the administrator or fiduciary is given discretionary power under the plan, his decisions are reviewed for abuse of discretion and will not be disturbed if they are reasonable." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995). An administrator's decision is reasonable if it is "'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Id.* at 788.

When an entity that administers an ERISA plan both determines whether an employee is eligible to receive benefits and pays those benefits out of its pocket, it faces a conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). A reviewing court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Id.* "[T]he word 'factor' implies . . . that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict

of interest is one." *Id.* at 2351.

Several legal considerations apply to the Court's review of the plan administrator's decision. First, "ERISA does not impose a treating physician rule, under which a plan must credit the conclusions of those who examined or treated a patient over the conclusions of those who did not." *White v. Sun Life Assurance Co. of Canada*, 488 F.3d 240, 254 (4th Cir. 2007). *See also McCready v. Standard Ins. Co.*, 417 F. Supp. 2d 684, 702 (D. Md. 2006) ("A preference for treating physicians' opinions is not found under ERISA."). Second, while a Social Security Administration disability benefits decision is not binding on a plan administrator, such a decision is relevant where the standard applied by the Social Security Administration in determining whether an applicant retains the capacity to perform any gainful employment is at least as restrictive as the plan standards at issue in the case. *Willis v. Baxter Int'l*, 175 F. Supp. 2d 819, 825 (W.D.N.C. 2001).

The parties agree in this case agree that the abuse of discretion standard applies to this case as the Plan grants MetLife discretion. The Plan states:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(MET00189.) Thus, the Court must determine whether MetLife's decision was reasonable, e.g. whether it was "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."

MetLife argues that the decision to terminate Berger's benefits was the result of a reasonable process based on substantial evidence. MetLife asserts that it began to reconsider Berger's benefits when it learned about her volunteer work at the animal shelter. At that point, MetLife requested the

10

FCE. After completion of the FCE, MetLife forwarded the FCE report to Berger and her doctors for comment. Dr. Meleka and Berger both contested the finding that Berger was capable of full-time light work, but both opined that Berger might be capable of part-time work. Dr. Meleka also continued to assert his prior diagnosis of Berger. After receiving these comments, MetLife forwarded the file to the first IPC, who concluded that Berger was capable of working.

MetLife then considered the first IPC's conclusion, the FCE, and Berger and Meleka's comments on the FCE. After this review, MetLife determined that Berger was capable of light work. MetLife then determined that Berger's former position was that of a Programmer-Analyst, as defined by the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"). MetLife looked at the DOT's description of duties for a Programmer-Analyst and decided that the position was a sedentary position that required use of a computer and knowledge of computer programming techniques with minimal overhead reaching. Thus, MetLife determined that Berger could perform the duties of a Programmer-Analyst. After making this conclusion, MetLife's Vocational Counselor performed a Labor Market Analysis, which found that Berger could earn at least 80% of her prior wages as a Programmer-Analyst.

MetLife also argues that Berger had the opportunity to appeal the decision to terminate her benefits and to present additional evidence during the appeal. Berger did not submit additional evidence. Indeed, the only evidence Berger provided after October 2006 was a brief report by Dr. Meleka that he relied on his previous diagnosis. Prior to ruling on her appeal, MetLife forwarded Berger's case to the second IPC for a review. Berger's doctors were given the opportunity to comment on the second IPC's report, but neither doctor provided a substantive response. MetLife subsequently denied Berger's appeal.

Berger argues that this process was not reasonable and that the decision was not based on substantial evidence because: (1) MetLife had a conflict of interest; (2) the FCE was a short examination that lasted on a few hours; (3) neither IPC met with Berger's treating doctors; (4) Berger's doctors were only given six days to comment on the second IPC report; (5) MetLife did not consider Berger's subjective assessments; (6) MetLife did not give weight to the SSA's decision to award Berger SSDI benefits; and (7) MetLife did not consider the overwhelming evidence of Berger's medical problems.

MetLife replies that SSA decisions are different because the SSA is required to place greater weight on the opinions of treating doctors. *See McCready*, 417 F. Supp. 2d at 702. MetLife also asserts that there is no proof in the record that the SSA knew of Berger's volunteer work at the animal shelter. MetLife says that its decision was based on substantial evidence, including: (1) the FCE report; (2) the two IPC reports; (3) Berger's work at the animal shelter; (4) the fact that Berger's doctors did not produce an objective evidence to rebut the FCE or IPC reports; (5) Berger's failure to provide continued proof of her disability; and (6) the fact Berger and her doctor opined that Berger was, at a minimum, able to perform part-time work.

This case is an interesting and difficult one. The Court has spent countless hours reviewing the record and has questions regarding the positions of both parties. Were the Court reviewing this case de novo, the Court may well side with Berger. However, the Court must review MetLife's decision for abuse of discretion. On this record, the Court cannot find that MetLife abused its discretion. In reaching this decision, the Court recognizes that *Glenn* requires the Court to consider MetLife's conflict of interest as a factor. However, the Court finds that a majority of other factors favor a finding that MetLife did not abuse its discretion.

The Court first notes that the process used by MetLife was reasonable. MetLife conducted a FCE and consulted several IPCs. MetLife provided Berger with numerous opportunities to comment on the FCE and IPC reports, and to provide updated medical evidence showing disability. Berger provided little substantive response. It appears that MetLife reached its decision after considering the FCE, IPC reports, the recommendations and findings of the Vocational Counselor, Berger's part-time volunteer work, and medical records from Berger's treating doctors. The IPCs appear to have reviewed Berger's entire case file, and the second IPC appears to have considered the SSA's decision. True, the IPCs did not contact Berger's treating physicians. However, as previously stated, there is no treating physician rule in the Fourth Circuit. *See White*, 488 F.3d at 254. Moreover, the Court notes that MetLife was not bound to follow the decision of the SSA. In particular, the Court notes that the SSA gave preference to the opinions of treating physicians. No such preference is required of MetLife.

The more difficult question is whether the evidence relied upon by MetLife was substantial. As a starting point, there is a voluminous amount of evidence in the record to suggest that Berger suffered from back problems and carpal tunnel syndrome. Having reviewed other cases in the Fourth Circuit, it seems that Berger must merely provide evidence that she suffered a disability. *See, e.g, Smith v. Met. Life Ins. Co.*, 274 Fed. Appx. 251 (4th Cir. 2008) (finding that the plaintiff sufficiently supplied proof of disability because the plaintiff himself provided reports about his problems and provided reports from his treating doctors). Berger clearly has done that. MetLife can then rely on conflicting reports to terminate benefits, but only if those conflicting reports are substantial. *See id.* at 256.

The Court has read the FCE report and notes that the exam appeared to last a short time. This fact raises some questions with the Court as to whether the FCE, alone, is substantial evidence. The Court notes, however, that MetLife relied on more than just the FCE report in reaching its decision. Notably, MetLife relied on: (1) two IPC reports (who considered the SSA's decision and the medical records in Berger's case file); (2) the fact that Berger was performing part-time volunteer work; (3) the fact that Berger's doctors' opinions appear to be based solely on those doctors' subjective opinions regarding whether Berger was disabled and do not present objective tests that show a disability; and (4) Berger's failure to provide updated medical evidence between the February 2007 termination of benefits and the appeal decision in October 2007.

"Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that 'a reasoning mind would accept as sufficient to support a particular conclusion.'" *Donnell v. Metro. Life Ins. Co.*, No. 04-2340, 2006 WL 297314, at *4 (4th Cir. Feb. 8, 2006). The Court finds that the evidence relied upon by MetLife is substantial. The evidence was more than a scintilla, and—while the Court might not reach the same conclusion as MetLife if it reviewed this case de novo—the Court does believe that there was enough evidence for a reasoning mind to rely on. Unlike *Glenn*, the IPC reports in this case were unequivocal, the IPC and MetLife did consider the SSA's decision, and MetLife provide all of Berger's medical records to the IPCs and Vocational Counselor. Indeed, the second IPC report is a 12-page report that marches through all of the evidence reviewed by the second IPC, which included numerous documents showing Berger's past medical problems. The Court does have some concerns as to how the IPCs and FCE could reach results contrary to Berger's prior medical evidence, but those concerns alone do not render this evidence insubstantial. In reaching this

decision, the Court notes that the IPC considered and did not agree that Berger's medications would prevent her from returning to work. The second IPC opined that if Berger could drive and volunteer at the animal shelter while on her medications, she could probably return to sedentary work while on those medications. Contrary to Plaintiff's assertion, the Court finds that statement reasonable. Finally, the Court notes that, after reviewing the FCE report, Dr. Meleka and Berger opined that Berger could probably return to part-time work. Nothing in the record indicates that Berger pursued that possibility. While that fact is not dispositive, it does raise questions with the Court.

On the whole, the Court does not believe the record justifies a finding that MetLife abused its discretion.

### B.     **Fiduciary Duty**

Berger argues that MetLife is liable under 29 U.S.C. § 1132(a)(3) for breach of fiduciary duty. Berger asserts that MetLife breached its fiduciary duty by arbitrarily denying her benefits claim. Defendant argues that Berger cannot bring this claim because she can seek relief through a claim for denial of benefits. Berger essentially responds that her breach fiduciary duty claim is a backup claim in the event that the Court denies her denial of benefits claim.

"Individualized equitable relief under § 1132(a)(3) is normally appropriate only for injuries that do not find adequate redress in ERISA's other provisions." *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 102 (4th Cir. 2006). "Because adequate relief is available for the plaintiff's injury through review of her individualized benefits claim under § 1132(a)(1)(B), relief under § 1132(a)(3) will not lie." *Id.* at 102-103. *See also Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996).

In *Korotynska*, the plaintiff brought suit against MetLife under § 1132(a)(3) for breach of fiduciary duty by "engaging in systematically flawed and abusive claims administration procedures

. . . ." The *Korotynska* court stated: "The plaintiff's injury here–denial of benefits by the plan administrator–plainly gives rise to a cause of action under § 1132(a)(1)(B) and as such would usually be appealed under that provision." *Korotynska*, 474 F.3d at 106. The *Korotynska* court also noted that "the great majority of circuit courts have interpreted [*Varity Corp.*] to hold that a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3)." *Korotynska*, 474 F.3d at 106.

Under *Korotynska*, Berger cannot recover for breach of fiduciary duty under these circumstances. Berger's claim is for denial of benefits, and ERISA provides a remedy for such a claim elsewhere. Under such circumstances, a claim for breach of fiduciary duty under § 1132(a)(3) is not available. *See Korotynska*, 474 F.3d at 106.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross Motion for Summary Judgment. A separate Order will follow.


   July 27, 2009                                                    /s/
        Date                                          Alexander Williams, Jr.
                                                      United States District Judge